# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SAJAL ROY,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil No. 1:08-CV-2015** |
| | : | |
| **v.** | : | **(Judge Munley)** |
| | : | |
| **CONTINUING CARE RX, INC.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

The Plaintiff, Sajal Roy, is a United States citizen of Indian descent who was formerly employed with Defendant Continuing Care RX, Inc. ("Defendant" or "CCRx"). Roy began his employment at CCRx in 2007 as a staff pharmacist before being promoted to other positions, including Director of Professional Placement/Assistant Regional Manager, a position he assumed in January 2008.  Roy was subsequently terminated in March of 2008, after an investigation revealed that he and his fiancé, CCRx pharmacist Lisa Tomcykoski, had provided an unlicensed employee with a set of keys that would have permitted her unsupervised access to the pharmacy.

Roy commenced this lawsuit on November 6, 2008, alleging that he was terminated unlawfully in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 because he was engaged to a Caucasian woman, and due to his national origin. CCRx has moved for summary judgment on Plaintiff's claims. (Doc. 25.) The motion is fully briefed and ripe for disposition. Because we believe that the unique facts of this case present material and unresolved factual issues which preclude the entry of judgment as a matter of law on the Plaintiff's claims under a mixed-motive or "direct evidence" theory, we will recommend that the Court deny the Defendant's motion for summary judgment.

## II.   STATEMENT OF FACTS AND OF THE CASE

CCRx is a company that provides long-term care pharmacy to the residents of skilled and assisted living facilities in Pennsylvania, New York, Illinois, North Carolina, and Florida. (Doc. 26, at Ex. D.) The Plaintiff is an American citizen, whose father was born in India, and whose mother is from West Virginia. (Doc. 31, at 4.) Plaintiff began working for Defendant on April 24, 2007, as a staff pharmacist. (Doc. 2, Ex. A at ¶ 15.) At the time that Plaintiff was hired, Thomas Trite, Defendant's CEO and owner, knew that Plaintiff was of Indian descent. (Doc. 2, Ex. D at 18-19, and Doc. 31 at ¶ 7.) Also at the time he was hired, Plaintiff was

romantically involved with a woman named Jamie, who is Caucasian.[1] (Doc. 26, Ex. C, Deposition of Sajal Roy, at 38-39, and Ex. D at 25.)

During the fall of 2007 and early 2008, a number of employment changes took place within CCRx. Approximately two to three months after he was hired, Roy was promoted to Pharmacy Director of Defendant's Pittston, Pennsylvania pharmacy. (Doc. 26, Ex. C at 38-39.) Shortly thereafter, in October 2007, Plaintiff hired Lisa Tomcykoski, a Caucasian female, to work as a pharmacist for Defendant. (Doc. 26, Ex. C at 97.) Sometime in December 2007, Ms. Tomcykoski was promoted to the position of Pharmacy Director at the Pittston pharmacy. Thereafter, in January 2008, Plaintiff was promoted to become CCRx's Director of Professional Placement/Assistant Regional Manager. (Doc. 26, Ex. C at 71.) Mr. Trite was involved in the decision to promote the Plaintiff. (Doc. 26 at ¶ 14; Doc. 31 at ¶ 14.) In addition to Plaintiff's and Ms. Tomcykoski's respective promotions, Defendant hired Robert Weir as the company's Chief Operating Officer in January 2008. (Doc. 26 at ¶ 15.)

---

[1] There is some lack of clarity in the record as to whether Thomas Trite, Defendant's owner and CEO, knew that Plaintiff and Jamie were engaged, or whether he knew only that the two were dating. (Doc. 31 at ¶ 14.) Although the evidence on this point is limited, Mr. Trite appears to have testified that he was aware that Plaintiff had been engaged to a Caucasian female. (Doc. 26, Ex. D, Deposition of Thomas Trite, at 25.)

During this time of change within the pharmacy, Plaintiff's romantic relationships were also in a state of flux. In or around November or December 2007, Plaintiff and Jamie broke off their engagement, and in late January 2008, Plaintiff became romantically involved with Ms. Tomcykoski. (Doc. 26, Ex. C, Roy Dep. at 99, and Ex. F at 19.) The new relationship between Plaintiff and Ms. Tomcykoski did not go unnoticed within the company. By mid-January 2008, various management-level employees believed that Plaintiff was dating Ms. Tomcykoski. (Doc. 26, Ex. C, Roy Dep. at 231-32; Ex. E, Lescavage Dep. at 30-31.)

Kristina Manbeck, CCRx's Human Resources Manager, was advised in January 2008 by two CCRx employees that Plaintiff and Ms. Tomcykoski were involved in a romantic relationship. According to Ms. Malbeck, these employees notified her about the relationship because they expressed concern that Ms. Tomcykoski reported directly to Plaintiff. (Doc. 26, Ex. H, Dep. of Kristina Manbeck, at 60-62.) Ms. Manbeck attests that she told Patrick Loughlin, who served as the company's Chief Operating Officer prior to Robert Weir, to be sure that there was no direct reporting between Ms. Tomcykoski and Plaintiff because they were in a romantic relationship. (Id. at 62.)

In February 2008, Plaintiff and Ms. Tomcykoski became engaged. (Doc. 26, Ex. F, Dep. of Lisa Tomcykoski, at 19.) On or about March 7, 2008, Roy sent an

email to Thomas Trite and another CCRx representative, formally notifying them that he and Ms. Tomcykoski were engaged to be married. (Doc. 26 at ¶ 22 and Ex. I.)

According to Roy, at the time that he made this announcement to Mr. Trite he was aware that Trite held views disapproving of interracial marriages. Roy professes to be aware of Trite's views in this regard due to a series of statements which he claims Trite had made to him over the time that the two men worked together. Beyond, Roy's account of these statements–which is disputed by Trite–the Plaintiff presents no proof for this factual assertion.

In any event, with days of this announcement by Roy, events occurred that eventually lead to Plaintiff being dismissed from employment with CCRx. These events began on or about March 12, 2008, when Maria Noone, an unlicensed pharmacy technician supervisor, complained to CCRx that on March 8, 2008, Plaintiff and Ms. Tomcykoski gave her a key to CCRx's Pittston pharmacy. (Doc. 26 ¶ 23 and Ex. H, Manbeck Dep., at 15-16, 27.) In addition, Ms. Noone complained via email sent on March 12, 2008, that she "knew without a doubt that it is illegal for anyone to be in the pharmacy without a registered pharmacist present." (Doc. 26, Ex. J; see also Doc. 26, Ex. K, Dep. of Maria Noone, at 33.) Kristina Manbeck, CCRx's Human Resources manager, who received these complaints, also understood that unlicensed pharmacy technicians were not permitted to have keys to the pharmacy

because it was a violation of Pennsylvania's Pharmacy Code. (Doc. 26 ¶ 29 and Ex. H, Manbeck Dep., at 37.) For this reason, Ms. Manbeck considered the fact that Plaintiff and Ms. Tomcykoski were alleged to have given a key to an unlicensed pharmacy technician to have been a terminable offense. (Doc. 26, Ex. H, Manbeck Dep. at 23-24; 28-29.) Manbeck was unaware of any other circumstance in the company where an unlicensed pharmacy technician was provided a key to the pharmacy. (Id.)

Manbeck brought the matter to Robert Weir's attention, who stated that he "didn't think it was appropriate for a technician to have been given the keys to the pharmacy," and began the termination process as a result. (Doc. 26 ¶ 33.) While Weir undeniably took the lead in this employment matter, Trite also participated in a more limited way in the resolution of this issue. For example, Robert Weir and Thomas Trite met with Plaintiff and Ms. Tomcykoski on March 13, 2008, to address the issue about the key that was provided to Ms. Noone. (Doc. 26 ¶ 35.) Mr. Trite attested during his deposition that giving a key to the pharmacy to an unlicensed pharmacy technician, and thereby providing her with access to the pharmacy, was a violation of CCRx's pharmacy technician protocol, which states that "[technicians] can't have access to the pharmacy without a pharmacist being present." (Doc. 26, Ex. D, Trite Dep. at 26-27, 39, 42-43, 45.) During the meeting with Messrs. Weir and Trite,

Plaintiff and Ms. Tomcykoski admitted that they gave Maria Noone the key to the Pittston pharmacy. (Doc. 26 ¶ 38.) It is further undisputed that it was Roy's idea to give the key to Ms. Noone. (Id. ¶ 39.) In fact, Roy testified that they he provided the key to Ms. Noone because of his concerns that if a pharmacist were unable to make it to work, or would be delayed, a technician with a key could, if necessary, obtain the alarm code and enter the pharmacy to fill prescriptions. (Doc. 31 ¶ 44.) Roy candidly attested to his belief that "it was stupid" that no one other than licensed pharmacists could have keys to the pharmacies. (Doc. 21 ¶ 44, Ex. C, Roy Dep. at 137-138.)

Upon being informed that he and Ms. Tomcykoski were being terminated, effective immediately, because they furnished the key to the Pittston pharmacy to Maria Noone, Roy asserted that the Pennsylvania Pharmacy Code, and CCRx's own practices, did not prohibit Ms. Noone from having a key. (Doc. 26 ¶ 40.) Roy has also testified that on the day he met with Messrs. Weir and Trite, he informed both of them that he understood that keys, and even alarm codes, had been provided to non-pharmacists at other CCRx pharmacies. (Doc. 31 ¶ 40.) In response to these allegations, Robert Weir suspended Plaintiff and Ms. Tomcykoski pending an investigation. (Doc. 26 ¶ 45.)

Notwithstanding Plaintiff's allegations, the record reveals that an investigation into Plaintiff's claims failed to substantiate them in any way. Furthermore, there is

no evidence that either Robert Weir or Thomas Trite had any knowledge that non-pharmacists had been provided keys or alarm codes at any CCRx pharmacies, other than the key that Plaintiff and Ms. Tomcykoski provided to Maria Noone. (Doc. 26 ¶ 42; Doc. 31 ¶ 42.)

Following receipt of the allegations from Roy about other unlicensed technicians having been provided keys or alarm codes, Robert Weir instructed Kristina Manbeck to conduct an investigation into the issues Roy raised during the March 13, 2008 meeting. Although the Plaintiff takes issue with the quality of the investigation conducted, (Doc. 31 ¶ 48), it is undisputed that Ms. Manbeck conducted an investigation and talked with CCRx employees in Pittston and Norristown, pharmacies where Plaintiff and Ms. Tomcykoski worked while employed by CCRx, reviewed the Pennsylvania Pharmacy Code and CCRx's pharmacy technician protocol, and interviewed the individuals that Plaintiff claims also had keys. (Doc. 26 ¶ 48.) According to Ms. Manbeck, her investigation did not uncover any information that other non-pharmacists had been given keys to CCRx pharmacies. (Doc. 26 ¶ 50.)

The Plaintiff and Ms. Tomcykoski have acknowledged that the Pittston pharmacy is a "closed-door pharmacy," which differs from a "retail pharmacy." (Doc. 26, Ex. C, Roy Dep. at 18, 139-140; Ex. F, Tomcykoski Dep. at 92.) Although

Plaintiff offered his understanding that the Pennsylvania Pharmacy Code permitted him to provide a key to Maria Noone, (Doc. 26 ¶ 55; Doc. 31 ¶ 55), the provision of the Pharmacy Code on which he relied for this assertion applies only to "retail" establishments. (Doc. 26 ¶¶ 55-56.) Beyond applying only to retail pharmacies, the particular provision of the Pharmacy Code in question provides that even retail pharmacies "shall be securely locked whenever a licensed pharmacist is not present and on duty." 49 Pa. Code. § 27.16(b)(2)(ii). The Pharmacy Code further provides that all pharmacies "shall be closed whenever a licensed pharmacist is not present and on duty." 49 Pa. Code § 27.16(b)(2)(iii). The Pharmacy Code also provides that, with respect to any pharmacy, "the prescription area shall be arranged so that prescription drugs and devices are inaccessible to an unlicensed or unauthorized person." 49 Pa. Code § 27.16(b)(8). A pharmacy technician is defined by the Pharmacy Code as "an unlicensed person working in a pharmacy to assist a pharmacist in the practice of pharmacy in accordance with § 27.12." 49 Pa. Code § 27.1.

The Pharmacy Code expressly provides that a pharmacy technician is prohibited from entering, or being present in, a pharmacy whenever a licensed pharmacist is not on duty. 49 Pa. Code § 27.12(d)(3)(ii). The Pharmacy Code provides further that the manager of a pharmacist "shall create and maintain a written

protocol for each pharmacy technician employed in the pharmacy. The protocol shall specify each duty which the pharmacy technician may perform." 49 Pa. Code § 27.12(d)(4). Pursuant to this provision, CCRx has promulgated a pharmacy technician protocol, which provides that "pharmacy technicians may not perform the following: Be present in a pharmacy without the presence of a licensed pharmacist." (Doc. 26 ¶ 66.) Roy testified that the CCRx pharmacy technician protocol did not apply to him because he was a pharmacist, but it is undisputed that he provided the pharmacy technician protocol to Lisa Tomcykoski when she was hired, signed her copy as a witness, and acknowledges that he was responsible for enforcing the protocol. (Doc. 26, Ex. C, Roy Dep. at 143, 151.) Roy has stated that he believes that the Pharmacy Code is "outdated" and "that's the problem." (Doc. 26, Ex. C, Roy Dep. at 142.) The Plaintiff also argues repeatedly that the Pharmacy Code and CCRx protocol were never violated when he provided Ms. Noone the key to the pharmacy, because she was never actually in the pharmacy without a licensed pharmacist present.

Nevertheless, following an investigation, Robert Weir determined that Roy had, in fact, violated the Pharmacy Code and CCRx policy by giving the keys to the pharmacy to an unlicensed technician. (Doc. 26 ¶ 76.) Weir took his decision to terminate Plaintiff and Ms. Tomcykoski to Thomas Trite, who approved of and

authorized the decision.  (Id. ¶ 77.)  Robert Weir testified that the fact of Plaintiff's engagement to Ms. Tomcykoski had no impact on the decision to terminate their employment, and that the decision was based only on the fact that they provided the key to the Pittston pharmacy to Maria Noone.  (Doc. 26, Ex. G, Weir Dep. at 30.) Plaintiff has admitted that he has no evidence that Robert Weir is a racist or is otherwise opposed to interracial relationships.  (Doc. 26, Ex. C, Roy Dep. at 60, 69.) Furthermore, Robert Weir testified that nobody at CCRx, including Thomas Trite, ever said anything to him about the fact of Plaintiff's and Ms. Tomcykoski's engagement.  (Doc. 26, Ex. G, Weir Dep. at 31-32.)

Following his termination, Plaintiff filed a complaint with the Equal Employment Opportunity Commission on April 24, 2008, alleging that his termination was motivated by racial discrimination and national origin discrimination. (Doc. 26, Ex. B.) Following resolution of these administrative proceedings, Plaintiff commenced this action by filing a complaint on November 6, 2008, alleging that his termination violated Title VII and 42 U.S.C. § 1981.  (Doc. 1.)  Defendant answered the complaint on December 8, 2008.  (Doc. 4.)  Following discovery, Defendant moved for summary judgment, and that motion is now pending before the Court. (Doc. 25.)

## III.  STANDARD OF REVIEW

Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

IV.  **DISCUSSION**

A.    **Plaintiff's Claims of Discrimination**

Sajal Roy has alleged that the termination of his employment was motivated by unlawful discrimination against him on the basis of race or national origin, and also on the basis of associational discrimination by virtue of his engagement to a

Caucasian woman. In its motion for summary judgment, CCRx maintains that Roy's claims under either Title VII or 42 U.S.C. § 1981 should be analyzed under the familiar <u>McDonnell Douglas</u>[2] burden shifting framework that is applied to discrimination claims where there is no direct evidence of discrimination. We agree that claims of racial discrimination made pursuant to § 1981 are analyzed under the same burden-shifting framework for Title VII claims under <u>McDonnell Douglas</u>, and we will, therefore, apply this analysis to the Plaintiff's claims in this case. <u>See</u> <u>Jones v. School Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999).

Applying this analytical framework, Roy argues that his claims should survive summary judgment under either a <u>McDonnell Douglas</u> pretext theory, or under the so-called mixed-motive theory, originally set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989). A plaintiff is permitted to proceed under both theories, <u>see</u> <u>Armbruster v. Wilkinsburg</u>, 147 F.3d 272, 277-78 (3d Cir. 1998), and we will consider each separately below. For the reasons that follow, we find that, while this matter presents an exceedingly close case, disputed material factual issues preclude summary judgment for the Defendant under <u>McDonnell Douglas</u>, and as a mixed-motives case.

---

[2] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

**B.    Analysis of the Plaintiff's Claims Under the <u>McDonnell Douglas</u> Test**

Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for any employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." As noted above, the Third Circuit has indicated that a plaintiff invoking this section of Title VII may prove his case under either the pretext theory, set forth in <u>McDonnell Douglas</u>, or the mixed-motive theory first articulated in <u>Price Waterhouse</u>. <u>See</u> <u>Makky v. Chertoff</u>, 541 F.3d 205, 213 (3d Cir. 2008). In this section of the report, we consider Plaintiff's claims under the more traditional <u>McDonnell Douglas</u> standard.

Under <u>McDonnell Douglas</u>, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination by showing: (1) that he is a member of a protected class; (2) he is qualified for the employment position in question; (3) he suffered an adverse employment action; and (4) such action occurred under circumstances that give rise to an inference of unlawful discrimination. <u>Jones v. School Dist.</u>, 198 F.3d 403, 411 (3d Cir. 1999); <u>see also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Once an employee establishes a *prima facie*

case, the employer must articulate a permissible reason for taking the adverse employment action.  See, e.g., Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  At this stage, the employer's burden is "relatively light; it is satisfied if the [employer] articulates any legitimate reason for the [adverse employment action]; the [employer] need not prove that the articulated reason actually motivated the [action]." Id. (quoting Woodson v. Scott Paper, 109 F.3d 913, 920 n.2 (3d Cir. 1997).  If the employer carries its burden of articulating a legitimate basis for taking the adverse action, the burden returns to the employee to establish by a preponderance of the evidence that the employer's purportedly legitimate reason is, in fact, pretextual.  Id.

In order to show that an employer's proffered non-discriminatory reason is pretextual, a plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Notably, this is a "difficult burden on the plaintiff." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (internal quotation marks omitted).  The Third Circuit has explained that in order to satisfy this burden of proving pretext, a plaintiff "must demonstrate such weaknesses,

16

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence." Jones, 198 F.3d at 413. In considering the parties' competing arguments and evidentiary support, we must remain mindful that "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).

When assessing the legal sufficiency of an employment discrimination or retaliation claim, one factual matter that courts are cautioned to consider is the temporal proximity between the plaintiff's protected conduct, and the allegedly discriminatory or retaliatory actions of the defendant. In a civil rights context, it is clearly recognized that such temporal proximity can, in appropriate cases, "be probative of causation." Thomas v. Town of Hammonton, 351 F.33d 108, 114 (3d Cir. 2003)(citing, Rauser v. Horn, 241 F.33d 330, 334 (3d Cir. 2001)). However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,'." Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001), (citations omitted).

Defining when in a civil rights case questions of temporal proximity present factual issues permitting an inference of discrimination that defeat a summary judgment motion is necessarily a matter of degree. In this regard, our colleague, Judge Conner, has aptly observed:

> As the Third Circuit has stated:[I]t is causation, not temporal proximity itself, that is an element of plaintiff prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation. Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir.1997). For temporal proximity alone to establish causation, the time difference must be so short as to be "unusually suggestive of retaliatory motive." Marasco, 318 F.3d at 512. While the Third Circuit has not explicitly defined the closeness in time required to be "unusually suggestive" of retaliatory motive, the court has held that a temporal proximity of two days was sufficient to establish causation on its own, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n. 5 (3d Cir.2000), while a temporal proximity of tens days was sufficient to establish causation only when accompanied by other evidence of wrongdoing on the part of the employer, Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir.2003). This suggests that the difference in time must be measured in days, rather than in weeks or months, to suggest causation on its own. Where such closeness in time is lacking, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct" or any other suggestions of causation that can be gleaned from the record "as a whole" can also give rise to an inference of causation. Farrell, 206 F.3d at 280 (quoting Kachmar, 109 F.3d at 177); see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d

Cir.2003) (suggesting that "timing plus other evidence" may be an appropriate test for causation).

Ober v. Miller, No. 04-1669, 2007 WL 4443256, *11 (M.D.Pa. Dec. 18, 2007).

With the foregoing legal guidelines in mind, we turn to the case before the Court. Defendant has conceded, for purposes of summary judgment, that Plaintiff could articulate a *prima facie* case under McDonnell Douglas, and instead relies upon its assertion that Plaintiff was terminated because he gave the key to the Pittston pharmacy to a non-licensed pharmacy technician, in violation of both the Pennsylvania Pharmacy Code and CCRx policy. Defendant notes that it is undisputed that Plaintiff and Ms. Tomcykoski gave a key to the pharmacy to Maria Noone, who thereafter complained to management about having been provided the key. There is also no real dispute in the evidentiary record that upon learning of the allegations, CCRx's new Chief Operating Officer, Robert Weir, with the concurrence of Thomas Trite, determined to terminate both Plaintiff and Ms. Tomcykoski if the allegations proved to be true. The record also shows that the Plaintiff was first suspended, rather than terminated, pending an investigation into Plaintiff's assertion that he was actually permitted under the Pharmacy Code to provide the key to an unlicensed technician, and that other CCRx employees had furnished pharmacy keys to unlicensed employees. After a two-week investigation failed to substantiate

Plaintiff's assertions, Mr. Weir decided to recommend termination of the Plaintiff's employment and took his decision to Thomas Trite, CCRx's CEO for approval, which Trite gave. Defendant thus maintains that management had ample legitimate, non-discriminatory reasons for terminating Plaintiff's employment.

In response to this argument, Plaintiff offers a number of matters to support his contention that there exist disputed factual issues regarding whether the Defendant's stated reasons for firing him were pretextual. While the Plaintiff argues many such matters, for the most part we find that the matters offered by the Plaintiff are insufficient to define a material factual issue that would defeat summary judgment.

For example, the Plaintiff devotes great attention to his repeated assertion that his act of giving a key to Maria Noone did not actually violate the Pharmacy Code because the language of that regulation does not literally prohibit "the use or transfer of keys." (Doc. 32, at 8.) With respect to Plaintiff's argument that he actually did not violate the Pharmacy Code or CCRx policies by giving the key to the Pittston pharmacy to Maria Noone, we simply do not agree. We understand CCRx's position to be that by making a key to a closed door pharmacy available to an unlicensed pharmacy technician, Plaintiff created the very risk that the Pharmacy Code and CCRx policy manifestly prohibit: the presence of an unlicensed technician in the pharmacy without the supervision of a licensed pharmacist. Plaintiff's textual

arguments are not relevant to dispute the unchallenged position of CCRx that the very act of providing the key to Maria Noone violated both regulation and policy because it made possible precisely that which the regulations and policy disallow.

Similarly, Plaintiff also argues that the terms of the CCRx pharmacy technician protocol do not apply to him because he is a pharmacist rather than a technician, and thus, according to him, "a pharmacist cannot violate a protocol applicable only to pharmacy technicians any more than an airline pilot can violate a protocol applicable only to flight attendants." (Id.) Plaintiff further asserts that it is, in fact, a common practice in Pennsylvania for pharmacists to provide keys to non-pharmacists for use in emergency situations. In support of his own testimony on this point, Plaintiff notes that, Trite, CCRx's CEO testified that many years ago he himself had provided keys to non-pharmacists while working for Rite-Aid, a retail pharmacy. Plaintiff contends that he advised Robert Weir that other CCRx employees had been provided keys to various pharmacies in Pennsylvania, but that the investigation into his assertions was "incomplete," leading Plaintiff to suggest that a jury could reasonably infer that either Robert Weir or Thomas Trite deliberately withheld details from those persons investigating Plaintiff's allegations.

As for Plaintiff's claim that it was common practice to provide keys to non-pharmacists, and Plaintiff's related assertion that this practice was followed at other

CCRx pharmacies, as well as by CCRx CEO Thomas Trite while employed as a retail

pharmacist years prior, we conclude that the assertion, standing alone, would likely

not create a material factual dispute regarding whether this justification for his

termination was a mere pretext. Aside from being entirely self-serving and derived

almost exclusively from his own testimony, Plaintiff's evidence does not tend to

discredit the reasons that CCRx has given for his termination. Even accepting

Plaintiff's testimony as true, the fact that other pharmacies may permit unlicensed

employees to hold keys to pharmacies does not reasonably suggest that CCRx and its

management acted pretextually in stating that Plaintiff was fired for giving the key

to Maria Noone.[3]

The Plaintiff also asserts that Maria Noone lacks credibility, although he does

not clarify how her credibility bears upon the issue of pretext, something that is

---

[3]Additionally, Plaintiff's arguments about the alleged inadequacy of CCRx's investigation into his claim that other CCRx pharmacies had made keys available to unlicensed technicians or employees is both misplaced and, according to the evidence of record, incorrect. The evidence is clear that Robert Weir believed that providing a key to an unlicensed pharmacist was a serious violation, and grounds for termination. It is also clear that upon hearing Plaintiff's allegations regarding purportedly widespread or commonplace practices at other CCRx locations, Weir ordered an investigation. It is also undisputed that such an investigation was conducted, and failed to substantiate Plaintiff's allegations. Notwithstanding Plaintiff's argument that the investigation was inadequate, the evidence of record shows that Kristina Manbeck interviewed between 15 and 20 CCRx employees, and found no support for Plaintiff's claims.

particularly confusing given that it is undisputed that Plaintiff and Ms. Tomcykoski gave her the key to the Pittston pharmacy. We find no relevance to Plaintiff's suggestion that Maria Noone lacks credibility, and we do not perceive how her tendency for truthfulness has any bearing upon CCRx's ultimate decision to terminate Plaintiff's employment, particularly as Ms. Noone had no role in this process other than to inform management that Plaintiff had given her a key to the Pittston pharmacy – something Plaintiff admits that he did.

Finally, we do not believe that the isolated examples that Plaintiff has provided regarding disparaging statements allegedly made by two CCRx employees who were not involved in this employment decision– Andrew Peclet, or Patrick Laughlin–are sufficient to demonstrate pretext. While we must accept Plaintiff's testimony as true – although it is entirely unsupported and, in fact, flatly contradicted in a number of places in the record – we note initially that any comments that may have been made by Andrew Peclet or Patrick Laughlin are not probative of pretext, because these employees had nothing to do with CCRx's decision to terminate Plaintiff's employment. Any comments that these two employees may have made, or their feelings about interracial marriage or relationships, are simply not relevant to Plaintiff's claims. See Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1085

(3d Cir. 1995) ("[S]tray remarks by non-decision makers . . . are inadequate to support an inference of discrimination by the employer.").

While we find none of these assertions individually persuasive or sufficient to defeat summary judgment there is one combination of circumstances which we believe, on the unique facts of this case, precludes summary judgment. In this case we find that the confluence of the following four factors presents a factual question concerning the Defendant's motivation which defeats this summary judgment motion: (1) the Plaintiff's assertion that Thomas Trite made racially disparaging remarks to him concerning interracial marriages; (2) the admitted, albeit limited, involvement of Trite in the decision to discharge Roy for providing his key to a non-pharmacist; (3) the indications that Trite at another time and in another pharmacy may have himself permitted the same conduct which led to Roy's termination; and (4) the close temporal proximity of Roy's announcement of his engagement to a Caucasian woman and his termination.

Taken together, and recognizing that the issue of motivation of an employer is always highly context-specific, we find that these four factors may permit a fact finder to reach an inference that the otherwise valid justification for Roy's termination was pretextual. Such an inference, while certainly not compelled by this evidence, would be permitted by this proof and presents a question of fact which

cannot be resolved through this summary judgment motion since, as a legal matter, it has been held that a temporal proximity of two days was sufficient to establish causation on its own, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n. 5 (3d Cir.2000), and a temporal proximity of ten days was found sufficient to establish causation when accompanied by other evidence of bias or discrimination on the part of the employer, Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir.2003).

In reaching this conclusion we note that the Defendant has argued forcefully that the evidence does not fairly permit this inference since the intervening event of Plaintiff and Ms. Tomcykoski providing the Pittston keys to Maria Noone, and the investigation and discipline that followed promptly thereafter, substantially undermines Plaintiff's temporal proximity argument, particularly as it has been offered to show pretext.[4] While we concede the vigor of the Defendant's argument, and recognize that as a factual matter it might ultimately prove persuasive at trial, at

---

[4] In the case of claims for retaliation, the Third Circuit has found that although temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation, Rauser v. Horn, 241 F.3d 330, 334 (3d Cir. 2001), where intervening acts occur that serve to support the employer's adverse employment action, temporal proximity may be rendered insufficient to establish causation. Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003); see also Ober v. Miller, No. 1:04-CV-1669, 2007 U.S. Dist. LEXIS 93236, 2007 WL 4443256, at *12 (M.D. Pa. Dec. 18, 2007).

this juncture we are constrained to "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007). When we apply this principle we must, therefore, consider not only the temporal proximity of these events, but also:(1) take into account Roy's assertion that Mr. Trite made racially insensitive and disparaging remarks; (2) consider the evidence that Trite played a small but important role in the termination decision; and (3) assess the significance of the fact that, after learning of Roy's engagement, Trite approved the discharge of Roy for conduct similar to behavior which Trite may have condoned himself at a different place and time. When we weigh all of these factors, mindful of the fact that a temporal proximity of ten days has been found sufficient to establish causation when accompanied by other evidence of bias or discrimination on the part of the employer, Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir.2003), we conclude that this claim in its present posture presents factual issues which make summary judgment inappropriate.

## C.     "Mixed-Motives" Analysis of the Plaintiff's Claims

In response to Defendant's motion for summary judgment, Plaintiff has also suggested that his claims for discrimination should be evaluated under the so-called mixed-motives analysis, first articulated in Price Waterhouse, in addition to being considered under the traditional test established by McDonnell Douglas.  Defendant

has argued both that Plaintiff's claims, and the evidence in this case, are insufficient to trigger a mixed-motives evaluation, and that the claims would fail even if a mixed-motives analysis were appropriate.

The Third Circuit has held that "[a] Title VII plaintiff may state a claim for discrimination under either the pretext theory . . . or [a] mixed-motive theory . . . under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008) (internal quotation marks and citations omitted). Under a "mixed-motive" theory, a plaintiff may show an unlawful employment action by demonstrating "that race, color, religion, sex, or national origin was a motivating factor for the [adverse employment action], even though other factors also motivated the [action]." 42 U.S.C. § 2000e-2(m). This Court has cautioned that plaintiffs must "clear a high hurdle to make out a mixed-motives case." Kumar v. United Health & Hosp. Servs., Inc., 2007 WL 200958 (M.D. Pa. 2007). Indeed, a court should provide a mixed-motives instruction to a jury only where "the proffered evidence is sufficient to permit the fact finder to infer that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." Id.

For the reasons previously discussed, we believe that resolution of this "mixed motives" claim also turns on disputed factual issues. In particular, we believe that the

combination of Thomas Trite's allegedly racially disparaging remarks concerning interracial marriages; the admitted, albeit limited, involvement of Trite in the decision to discharge Roy for providing his key to a non-pharmacist; the indications that Trite may have himself once permitted the same conduct which led to Roy's termination; and the close temporal proximity of Roy's announcement of his engagement to a Caucasian woman and his termination present factual matters which a jury must assess in weighing a "mixed motives" claim.

## V. <u>RECOMMENDATION</u>

For the reasons set forth above, following due consideration, IT IS RECOMMENDED THAT Defendant's motion for summary judgment on Plaintiff's claims be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*__S/Martin C.  Carlson__*
Martin C. Carlson
United States Magistrate Judge

Dated: October 7, 2010.