# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SAJAL ROY,**     **Plaintiff** | No. 1:08cv2015 |
| v. | (Judge Munley) |
| **CONTINUING CARE RX, INC.,**     **Defendant** | |

## MEMORANDUM

Before the court for disposition is Magistrate Judge Martin C. Carlson's report and recommendation. Magistrate Judge Carlson recommends denying Defendant Continuing Care RX, Inc.'s ("CCR") motion for summary judgment. Defendant has filed objections to the report and recommendation, and the matter is ripe for disposition.

**Background**

Generally, the parties do not dispute or object to the facts as set forth in the report and recommendation, therefore, we adopt them as follows[1]:

CCR provides long-term care pharmacy to the residents of skilled and assisted living facilities. Plaintiff is an American citizen whose father was born in India, and whose mother is from West Virginia. Plaintiff began working for defendant on April 24, 2007, as a staff pharmacist. At the time that plaintiff was hired, Thomas Trite, defendant's CEO and owner, knew that plaintiff was of Indian descent. Also at the time of his hiring, plaintiff

---

[1]We quote the report and recommendation for these facts with several stylistic changes. To avoid repetition, citations to the record have been omitted.

was romantically involved with a woman named Jamie, who is Caucasian.[2]

During the fall of 2007 and early 2008, a number of employment changes took place within CCR.  Approximately two to three months after his hiring, Roy was promoted to Pharmacy Director of defendant's Pittston, Pennsylvania pharmacy.  Shortly thereafter, in October 2007, plaintiff hired Lisa Tomcykowski, a Caucasian female, to work as a pharmacist for defendant.  Sometime in December 2007, Tomcykoski was promoted to the position of Pharmacy Director at the Pittston pharmacy.  Thereafter, in January 2008, plaintiff was promoted to become CCR's Director of Professional Placement/Assistant Regional Manager.  Trite was involved in the decision to promote the plaintiff.  In addition to plaintiff's and Tomcykoski's respective promotions, defendant hired Robert Weir as the company's Chief Operating Officer in January 2008.

During this time of change within the pharmacy, plaintiff's romantic relationships changed.  In or around November or December 2007, plaintiff and his fiancee broke off their engagement and in late January 2008, plaintiff became romantically involved with Tomcykoski.  The new relationship between plaintiff and Tomcykoski did not go unnoticed within the company.  By mid-January 2008, various management-level employees believed that plaintiff was dating Tomcykoski.

Kristina Manbeck, CCR's Human Resources Manager, was advised in January 2008 by two CCR employees that plaintiff and Tomcykoski were

---

[2]The record lacks clarity as to whether Trite knew that plaintiff and Jamie were engaged, or whether he knew only that the two were dating. Although the evidence on this point is limited, Trite appears to have testified that he was aware that plaintiff had been engaged to a Caucasian female.

involved in a romantic relationship. According to Manbeck, these employees notified her about the relationship because they expressed concern that Tomcykoski reported directly to plaintiff. Manbeck attests that she told Patrick Loughlin, the company's Chief Operating Officer prior to Weir, to be sure that there was no direct reporting between Tomcykoski and plaintiff because they were in a romantic relationship.

In February 2008, plaintiff and Tomcykoski became engaged. On or about March 7, 2008, plaintiff sent an email to Trite and another CCR representative formally notifying them that he and Tomcykoski were engaged to be married.

According to the plaintiff, at the time he made this announcement to Trite, he was aware that Trite held views disapproving of interracial marriages. Plaintiff professes to be aware of Trite's views in this regard due to a series of statements which he claims Trite had made to him over the time that the two men worked together

Within days of plaintiff's announcement, events occurred that eventually lead to plaintiff being dismissed from employment with CCR. These events began on or about March 12, 2008, when Maria Noone, an unlicensed pharmacy technician supervisor, complained to CCR that on March 8, 2008, plaintiff and Tomcykoski gave her a key to CCR's Pittston pharmacy. In addition, Noone complained via email sent on March 12, 2008, the she "knew without a doubt that it is illegal for anyone to be in a pharmacy without a registered pharmacist present." Manbeck, the Human Resources manager, who received these complaints, also understood that unlicensed pharmacy technicians were not permitted to have keys to the pharmacy because it was a violation of Pennsylvania's Pharmacy Code.

3

For this reason, Manbeck believed that the plaintiff and Tomcykoski could be terminated for giving Noone the key. Manbeck was unaware of any other instance in the company when an unlicensed pharmacy technician was provided a key to the pharmacy.

Manbeck brought the matter to Weir's attention, who stated that he "didn't think it was appropriate for a technician to have been given the keys to the pharmacy," and began the termination process for Tomcykoski and plaintiff as a result. While Weir undeniably took the lead in this employment matter, Trite also participated in a more limited way in the resolution of this issue. For example, Weir and Trite met with plaintiff and Tomcykoski on March 13, 2008, to address the issue about the key that was provided to Noone. Trite attested during his deposition that giving a key to the pharmacy to an unlicensed technician, and thereby providing her with access to the pharmacy, was a violation of CCR's pharmacy technician protocol, which states that "[technicians] can't have access to the pharmacy without a pharmacist being present." During the meeting with Weir and Trite, plaintiff and Tomcykoski admitted that they gave Noone the key to the Pittston pharmacy. It is further undisputed that it was plaintiff's idea to give her the key. In fact, plaintiff testified that he provided the key to Noone because of his concerns that if a pharmacist were unable to make it to work, or would be delayed, a technician with a key could, if necessary, obtain the alarm code and enter the pharmacy to fill prescriptions. Plaintiff candidly attested to his belief that "it was stupid" that no one other than licensed pharmacists could have keys to the pharmacies.

Upon being informed that he and Tomcykoski were being terminated

4

effective immediately, because the key, plaintiff asserted that the Pennsylvania Pharmacy Code, and CCR's own practices, did not prohibit Noone from having a key. Plaintiff also testified that on the day he met with Weir and Trite, he informed both of them that he understood that keys, and even alarm codes, have been provided to non-pharmacists at other CCR pharmacies. In response to these allegations, Weir suspended plaintiff and Tomcykoski -instead of immediately terminating them - pending an investigation.

Notwithstanding plaintiff's allegations, the record reveals that an investigation into plaintiff's claims failed to substantiate them in any way. Furthermore, there is no evidence that either Weir or Trite had any knowledge that non-pharmacists had been provided keys or alarm codes at any CCR pharmacies, other than the key that plaintiff and Tomcykoski provided to Noone.

Following receipt of the plaintiff's allegations about other unlicensed technicians having been provided keys or alarm codes, Weir instructed Manbeck to conduct an investigation into the issues plaintiff raised during the March 13, 2008 meeting. Although plaintiff takes issue with the quality of the investigation, it is undisputed that Manbeck conducted an investigation. The investigation included (1) talking to CCR employees in Pittston and Norristown, pharmacies where plaintiff and Tomcykoski worked while employed by CCR, (2) reviewing the Pennsylvania Pharmacy Code and CCR's pharmacy technician protocol, and (3) interviewing the individuals that plaintiff claimed also had keys. According to Manbeck, her investigation did not uncover any information that other non-pharmacists had been given keys to CCR pharmacies.

Plaintiff and Tomcykoski have acknowledged that the Pittston pharmacy is a "closed-door pharmacy," which differs from a "retail pharmacy." Although plaintiff offered his understanding that the Pennsylvania Pharmacy Code permitted him to provide a key to Noone, the provision of the Pharmacy Code on which he relied for this assertion applies only to "retail" establishments. Beyond applying only to retail pharmacies, the particular provision of the Pharmacy Code in question provides that even retail pharmacies "shall be securely locked whenever a licensed pharmacist is not present and on duty." 49 PA. CODE § 27.16(b)(2)(ii). The Pharmacy Code further provides that all pharmacies "shall be closed whenever a licensed pharmacist is not present and on duty." 49 PA. CODE. § 27.16.(b)(2)(iii). The Pharmacy Code also provides that, with respect to any pharmacy, "the prescription area shall be arranged so that prescription drugs and devices are inaccessible to an unlicensed or unauthorized person." 49 PA. CODE § 27.16(b)(8). A pharmacy technician is defined by the Pharmacy Code as "an unlicensed person working in a pharmacy to assist a pharmacist in the practice of pharmacy in accordance with § 27.12." 49 PA. CODE § 27.1.

The Pharmacy Code expressly provides that a pharmacy technician is prohibited from entering, or being present in, a pharmacy whenever a licensed pharmacist is not on duty. 49 PA. CODE § 27.12(d)(3)(ii). The Pharmacy Code provides further that the manager of a pharmacy "shall create and maintain a written protocol for each pharmacy technician employed in the pharmacy. 49 PA. CODE § 27.12(d)(4). Pursuant to this provision, CCR has promulgated a pharmacy technician protocol, which provides that "pharmacy technicians may not perform the following: Be

present in a pharmacy without the presence of a licensed pharmacist." Plaintiff testified that the CCR pharmacy technician protocol did not apply to him because he was a pharmacist, but it is undisputed that he provided the pharmacy technician protocol to Tomcykoski when she was hired, signed her copy as a witness, and acknowledges that he was responsible for enforcing the protocol. Plaintiff has stated that he believes that the Pharmacy Code is "outdated" and "that's the problem." Plaintiff also argues repeatedly that the Pharmacy Code and CCR protocol were never violated when he provided Noone the key to the pharmacy, because she was never actually in the pharmacy without a licensed pharmacist present.

Nevertheless, following an investigation, Weir determined that plaintiff had, in fact, violated the Pharmacy Code and CCR policy by giving the key to an unlicensed technician. Weir took his decision to terminate plaintiff and Tomcykoski to Trite, who approved of and authorized the decision. Weir testified that the fact of plaintiff's engagement to Tomcykoski had no impact on the decision to terminate their employment, and that the decision was based only on the fact that they provided the key to the Pittston pharmacy to Noone. Plaintiff has admitted that he has no evidence that Weir is a racist or is otherwise opposed to interracial relationships. Furthermore, Weir testified that nobody at CCR, including Trite, ever informed him that plaintiff was engaged to Tomcykoski.

Following his termination, plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging that his termination was motivated by racial discrimination and national origin discrimination. Following resolution of these administrative proceedings, plaintiff commenced this action by filing a complaint on November 6, 2008, alleging

that his termination violated Title VII of the civil rights act and 42 U.S.C. § 1981. At the close of discovery, defendant moved for summary judgment, which the Magistrate Judge recommends denying.
(Doc. 36, Report and Recommendation, 2 - 11).

**Jurisdiction**

As this case is brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* for unlawful employment discrimination and 42 U.S.C. § 1981, we have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Standard of review**

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made. 28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. Id.

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Discussion**

In recommending that summary judgment be denied, Magistrate Carlson reasoned as follows:

> The confluence of the following four factors presents a factual question concerning the Defendant's motivation which defeats this summary judgment motion: (1) the Plaintiff's assertion that Thomas Trite made racially disparaging remarks to him concerning interracial marriages; (2) the admitted, albeit limited, involvement of Trite in the decision to discharge Roy for providing his key to a

> non-pharmacist; (3) the indications that Trite at another time and in another pharmacy may have himself permitted the same conduct which led to Roy's termination; and (4) the close temporal proximity of Roy's announcement of his engagement to a Caucasian woman and his termination.

(Doc. 36 Report and Recommendation 24).

The defendant objects and asserts that these four factors should not be considered or given any significant weight.[3] We disagree and shall address each factor separately.

## 1. Plaintiff's assertion that Trite made disparaging remarks concerning interracial marriage

First, we note, that the plaintiff testified that Trite, as well as others employed by defendant, indicated regularly that they did not believe in people marrying outside of their own race. (Doc. 31, Pl. Ex. 1, Pl. Dep. 51-52). At the motion for summary judgment stage we must examine the facts in the light most favorable to the plaintiff. Therefore, for purposes of this motion, it can be taken for fact that Trite indicated that he did not like interracial marriages.

## 2. Decisionmaker

Next, the defendant argues that the although he is alleged to have made the disparaging remarks about interracial marriages, Trite played a limited role at best in the decision to terminate plaintiff's employment. Defendant claims that Robert Weir made the decision to terminate the plaintiff, and no evidence suggests that he has any racial animus, therefore, plaintiff's claims must fail. We disagree. Weir indicates in his

---

[3]The defendant also seeks oral argument on this matter. Based upon the extensive briefing and the court's schedule, we find that argument is not necessary.

10

deposition that Trite was indeed involved in the decision to terminate plaintiff's employment or that he "consulted" with Trite in coming to the decision. (Doc. 26-4, Weir Dep. at 15). Trite indicates that he participated in the decision in providing final authorization for the termination. (Doc. 31-8, Trite Dep. at 27, 53).

Under the law, a plaintiff alleging racial/national origin discrimination may meet his burden of persuasion if he presents direct evidence that his race/national origin was a substantial factor in the decision to fire him. Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 265-66 (1989)). In order to be considered "direct evidence" of employment discrimination, the proferred evidence must "demonstrate that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998). Here, plaintiff has provided evidence that Trite made comments disparaging interracial marriage. Plaintiff announced that he was engaged to a woman who had a different race/national origin from his own. Shortly, thereafter, Trite took part in the decision to terminate the plaintiff. Therefore, plaintiff has presented sufficient evidence to meet his burden of persuasion for purposes of a summary judgment motion.

**3. Did Trite engage in the same behavior for which plaintiff was terminated?**

The defendant's next argument is that Trite never before permitted the same conduct which led to plaintiff's termination, although the magistrate judge notes that he "may" have permitted the behavior in the past. Defendant's brief describes the action that Trite took in the past.

11

The plaintiff also thoroughly discusses this issue in his brief. It is clear that this is an issue for argument and presentation to the factfinder. It does not affect the summary judgment opinion.

## 4. Causal connection/temporal proximity

The last factor examined by the magistrate judge is the temporal proximity between the announcement of the plaintiff's interracial engagement and his termination. Plaintiff argues that an indication of discrimination arises because the process that led to his termination began within days after he announced his engagment to a white woman.

The defendant argues that the temporal proximity cannot be used as evidence of discrimination because between the date of the engagement announcement and the decision to terminate plaintiff, an occurrence broke the "causal chain." That occurrence was the notification by Noone that plaintiff had provided her a key to the pharmacy. See, e.g., Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000).

While the defendant may be correct, and the factfinder may ultimately agree, as the magistrate judge points out, at this stage we must view the facts in the light most favorable to the plaintiff. These matters are to be left to argument and examination of the witnesses at trial. They are not an appropriate basis for summary judgment.

**Conclusion**

For the reasons set forth above, the defendant's objections to the magistrate judge's report and recommendation will be overruled. The report and recommendation will be adopted, and the defendant's motion for summary judgment will be denied. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAJAL ROY, : No. 1:08cv2015
        **Plaintiff** :
         : (Judge Munley)
  v. :
CONTINUING CARE RX, INC., :
        **Defendant** :

## ORDER

    **AND NOW**, to wit, this 21st day of February 2011, it is hereby **ORDERED** as follows:

    1) The defendant's objections (Doc. 37) are hereby **DENIED**;

    2) Magistrate Judge Carlson's report and recommendation (Doc. 36) is **ADOPTED**; and

    3) The defendant's motion for summary judgment (Doc. 25) is **DENIED**.

                                  **BY THE COURT:**

                                  **s/ James M. Munley**
                                  **JUDGE JAMES M. MUNLEY**
                                  **United States District Court**